COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Coleman, Elder,
          Bray, Annunziata, Bumgardner and Senior Judge Overton
Argued at Richmond, Virginia


HURCUS JEROME WILLIAMS
                                              OPINION BY
v.    Record No. 2982-97-1         JUDGE JAMES W. BENTON, JR.
                                               MAY 2, 2000
COMMONWEALTH OF VIRGINIA


                   UPON A REHEARING EN BANC

          FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                   John C. Morrison, Jr., Judge

          Lenita J. Ellis for appellant.

          Steven A. Witmer, Assistant Attorney General
          (Mark L. Earley, Attorney General, on brief),
          for appellee.


     The trial judge convicted Hurcus Jerome Williams of capital

murder, robbery, and two counts of using a firearm in the

commission of a felony.  Williams contends the trial judge

committed reversible error by (1) admitting in evidence a

non-testifying accomplice's out-of-court confession to police

and (2) refusing to provide the accomplice's confession to

Williams' counsel before ruling on its admissibility.  A panel

of this Court, with one judge dissenting, affirmed the

convictions.  See Williams v. Commonwealth, 30 Va. App. 378, 517

S.E.2d 246 (1999).  Upon rehearing en banc, we reverse the

convictions and remand for a new trial.

I.

The grand jury indicted Williams for killing Vareck Griffin in the commission of robbery, see Code § 18.2-31 (capital murder), robbery, see Code § 18.2-58, using a firearm in the commission of capital murder, see Code § 18.2-53.1, and using a firearm in the commission of robbery. See id. The evidence at trial proved that early in the morning on December 1, 1996, someone shot and killed Vareck Griffin in Norfolk, Virginia, in an apartment where Griffin and others sold "crack" cocaine. One of the two men who operated the cocaine enterprise testified that he left Griffin alone in the apartment to sell cocaine to any potential customers.

Five and one-half months after Griffin was killed, the police arrested Damyel Harris for "more than 11 charges." The detective who interrogated Harris was investigating a homicide unrelated to Griffin's killing and had been searching for Harris in connection with that unrelated homicide. The detective testified that "[w]hen we started asking [Harris] about the [unrelated] homicide, [Harris] started talking about a different homicide and started giving details, and that's when [the detective] . . . realized that [Harris] wasn't talking about [the unrelated homicide] but another homicide." During the interrogation, Harris gave an extensive statement in which he confessed to participating in the robbery of Griffin and said Williams killed Griffin.

The Commonwealth called Harris as its witness.  When Harris asserted his Fifth Amendment privilege and refused to testify, the trial judge admitted in evidence Harris' confession and overruled Williams' objection that use of the confession violated his Sixth Amendment right to confront witnesses against him.  In addition to Harris' confession, the Commonwealth proved through the testimony of three witnesses that Williams had made statements, which the Commonwealth contends linked Williams to the murder and robbery of Griffin.

At the conclusion of the evidence, the trial judge convicted Williams of capital murder, robbery, and using a firearm in the commission of both felonies.  Williams contends on appeal that the trial judge committed reversible error by admitting Harris' confession in evidence and by refusing to provide Harris' confession to his counsel for review before the judge ruled on its admissibility.  In its brief on this rehearing en banc, the Commonwealth concedes that the trial judge's admission of Harris' confession was error, see Lilly v. Virginia, 527 U.S. 116, 139 (1999) (holding that "[t]he admission of the untested confession of [a codefendant] violated petitioner's Confrontation Clause rights"), and that the judge also erred in refusing to permit Williams' counsel to see the confession before the judge ruled on its admissibility.  The Commonwealth contends, however, that both errors were harmless.  We hold that the admission of Harris' confession was not

harmless error.  Because the trial judge's error in refusing to permit Williams' counsel to see Harris' confession will not recur if Williams is retried, we need not address whether that error was harmless.

## II.

Although Confrontation Clause error is of constitutional magnitude, it is subject to harmless error analysis.  See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986). Constitutional error is harmless, however, only if "the beneficiary of the constitutional error . . . prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  Chapman v. California, 386 U.S. 18, 24 (1967).  "The test, therefore, is not whether laying aside the erroneously admitted evidence there was other evidence sufficient to convict beyond a reasonable doubt . . . , but, more stringently, 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'"  Thompson v. Leeke, 756 F.2d 314, 316 (4th Cir. 1985) (citation omitted).  In other words, even if "the other evidence amply supports the . . . verdicts, [error is not harmless when] the disputed testimony may well have affected the . . . decision."  Cartera v. Commonwealth, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978).

An "emphasis and perhaps overemphasis, upon the [concept] of 'overwhelming evidence'" has the effect of clouding the

relevant question "'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Chapman, 386 U.S. at 23 (footnote and citations omitted). As the Supreme Court has stated, "[t]he correct inquiry is whether, assuming that the damaging potential of the [evidence] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Van Arsdall, 475 U.S. at 684; see also Olden v. Kentucky, 488 U.S. 227, 232 (1988). Thus, "a harmless error analysis . . . [is not] simply a sufficiency of the evidence analysis." Hooker v. Commonwealth, 14 Va. App. 454, 458, 418 S.E.2d 343, 345 (1992).

> Whether such an error is harmless in a
> particular case depends upon a host of
> factors. . . . These factors include the
> importance of the witness' testimony in the
> prosecution's case, whether the testimony
> was cumulative, the presence or absence of
> evidence corroborating or contradicting the
> testimony of the witness on material points,
> the extent of cross-examination otherwise
> permitted, and, of course, the overall
> strength of the prosecution's case.

Van Arsdall, 475 U.S. at 684. Thus, "Van Arsdall requires a court to consider several specific factors - more than just sufficiency of the evidence - when deciding whether the Confrontation Clause error was harmless beyond a reasonable doubt." Howard v. Gavin, 810 F. Supp. 1269, 1275 (S.D. Ga. 1993).

> Here we apply a more stringent standard
> against the government.  In a sufficiency
> analysis we review the evidence to determine
> whether the government has satisfied the
> minimum required in order for a reasonable
> juror to find guilt beyond a reasonable
> doubt.  In performing harmless error
> analysis, however, the standard cuts more
> sharply against the government:  there must
> be no reasonable possibility that the
> unconstitutionally obtained evidence
> contributed to the conviction.

United States v. Khoury, 901 F.2d 948, 960 (11th Cir. 1990)

(citing Chapman, 386 U.S. at 23).

Among the verdicts obtained in this case was one finding

Williams guilty of capital murder.  To support a conviction for

capital murder that is predicated upon murder in the commission

of robbery, see Code § 18.2-31(4), the Commonwealth must prove

beyond a reasonable doubt "a killing which takes place before,

during, or after the robbery and is so closely related in time,

place, and causal connection as to make the killing part of the

same criminal enterprise as the robbery."  George v.

Commonwealth, 242 Va. 264, 277-78, 411 S.E.2d 12, 20 (1991).  In

other words, the evidence must "support a conclusion that the

killing and theft were interdependent objects of a common

criminal design."  Quesinberry v. Commonwealth, 241 Va. 364,

374, 402 S.E.2d 218, 224 (1991).

An application of the Van Arsdall factors reveals that the

trial judge's error in admitting Harris' confession was not

harmless beyond a reasonable doubt.  Harris' confession was

central to the Commonwealth's case.  Cf. Timbers v.

Commonwealth, 28 Va. App. 187, 201, 503 S.E.2d 233, 239 (1998)

(holding trial judge's error in admitting accused's admission

concerning the falsity of her signature was not harmless because

it was the most important evidence proving forgery); Watson v.

Commonwealth, 19 Va. App. 659, 666, 454 S.E.2d 358, 362-63

(1995) (holding the influence of the inculpatory statements upon

the jury was not harmless where those statements constitute the

principal evidence establishing his knowledge and control of

contraband).  Assuming the damaging potential of Harris'

confession was realized, it established the essential causal

connection linking the killing to the robbery.  See Satterwhite

v. Texas, 486 U.S. 249, 259 (1988) (holding that expert's

testimony on "future dangerousness was critical to the death

sentence" and was thus not harmless beyond a reasonable doubt).

In pertinent part, Harris' confession recounted the

following events:

> [M]e and [Williams] met up one night. . . .
> He told me that we could do a hit, get some
> crack, a little bit of money. . . .  I asked
> him where was it at.  He said Park Place.  I
> said no, I'm too hot out here; I been
> chilling out.  I said, do the guys know me?
> So he was like, no, they don't know neither
> one of us.  So, we went around to the house,
> walked up the stairs.  I knocked on the
> door; [Williams] stood on the side.
>
> When the guy opened the door, he had a
> gun in his hand.  [Williams] punched the
> guy; the gun fell.  Both of them went
> reaching for the gun.  I grabbed a bottle

and hit the guy in the head.  Then [Williams] grabbed the guy.  We shut the door; [Williams] grabbed the guy, took him to the back.  He told me to look up under the couch and grab the dope and look on the table and grab the scales.  So when I was reaching for the scales, I heard a gunshot, one gunshot.  And I heard the guy say, please don't kill me.  So then I went up under the couch and found the drugs.  That's when I heard two more gunshots above five seconds later.

Then [Williams] came running out the door.  He went straight out the door and I yelled his name.  He told me not to yell his name; he kept running across the street.  So I ran over there to him, went up in the hallway and he said, we'll meet . . . on the back street and split up everything.  So when we got around there on the back street, he counted out ninety some dollars.  He said he needed the money for something, like that and told me I could take the high side of the crack and that's what we did.  He told me he'll sell the scales and give me some money the next day.

Although the Commonwealth produced at trial three witnesses who testified that Williams made statements implicating himself in a killing, we cannot conclude beyond a reasonable doubt that the improperly admitted testimony did not affect the verdict. Indeed, we cannot even conclude that the testimony of those witnesses and the other circumstantial evidence were sufficient, without Harris' statement, to prove that Williams killed Griffin, that a robbery occurred, or that a robbery bore the essential causal connection to the killing.  As to those elements, Harris' confession was crucial, indeed essential, to the Commonwealth's case.  "There was no physical evidence such

as fingerprints . . . or human blood evidence to link [Williams to the events that occurred in the apartment]." Lilly v. Commonwealth, 258 Va. 548, 552, 523 S.E.2d 208, 209 (1999).

Harris' confession was not cumulative of the other evidence the Commonwealth presented at trial. Jesse Keene testified that Williams informed him that he had been "lay[ing] low" because, when Williams and Harris went to the apartment, "the other kid that was there got killed in the process." Keene further testified as follows:

> Q. Did [Williams] tell you anything else about what happened at [the apartment]?
>
> A. Other than that, no.
>
> Q. Did he tell you how the kid that was at [the apartment] got killed?
>
> A. No.

Keene's testimony clearly is insufficient to prove that Williams shot Griffin or that a robbery occurred. Although the trier of fact arguably might infer from Keene's testimony that Griffin was shot while Williams and Harris were at the apartment and that either Williams or Harris may have committed the murder, it is impossible to determine from Keene's testimony who in fact shot Griffin. It is just as likely that Williams was "lay[ing] low" because he was present at the apartment when Harris or someone else shot Griffin (and, therefore, feared being accused of the murder) as that Williams was "lay[ing] low" because he shot Griffin.

Jason Carter testified that while he and Williams were in jail, he overheard Williams tell another prisoner that Williams was in the apartment when Griffin was shot and killed. In pertinent part, he testified as follows:

Q. What did you hear [Williams] say?

A. I heard him say that he went into the house and . . . [Griffin] was the only one there, and he went for the gun and he tussled--

Q. Who had the gun originally?

A. [Griffin].

Q. Who went for the gun?

A. [Williams].

Q. Did he say what happened after that?

A. He said he got the gun from him and he was shot.

Q. Who was shot?

A. [Griffin].

Q. Did he say who shot [Griffin]?

A. No. He just say he grabbed the gun from him. I was believing that he had shot him because by the way he was talking.

Q. Did he say why [Griffin] got shot?

A. I guess because he tried to give up the fight.

Q. Did he say why he went to the house where [Griffin] was?

A. No.

Q. Did he say if he went alone or with someone else?

A. It was with someone else.

This testimony does not clearly establish that Williams shot Griffin and clearly fails to prove a robbery occurred. Moreover, because Carter was Griffin's cousin, and Carter testified to being "close" to Griffin, we cannot conclude that the trier of fact would nonetheless have believed Carter's testimony, despite his bias, had Harris' statement been excluded.

Thomas Liggins testified that he met Williams in jail. Liggins admitted to having been convicted of two felonies and of making a false statement. He also testified that other charges were pending against him at the time of Williams' trial. Admitting further that, in return for his testimony, the Commonwealth agreed to a suspended sentence on his pending felony charge and to other consideration, Liggins testified as follows:

Q. What did [Williams] tell you?

A. That he shot somebody.

Q. Did he tell you where he shot this person?

A. No.

Q. Did he tell you who it was?

A. No.

Q. Did he tell you the circumstances of how he shot this person?

A.  No.  He just say he ain't had no mask
on, he had to shoot him. . . .

Q.  Did he tell you what was happening when
he shot the person?

A.  No.

Q.  Did he tell you whether he was alone or
with someone else when he shot this person?

A.  He was with someone.

Q.  Did he tell you if it was a man or a
woman that he shot?

A.  He ain't say.

Q.  Did he say whether he did the shooting
or the other person did the shooting?

A.  He said he did the shooting.

Q.  Did he tell you what the other person
did?

A.  Yeah.

Q.  What did he say the other person did?

A.  He said he hit him with a bottle.

Q.  Did he tell you whether this happened in
a house or outside on the street?

A.  No, he ain't say.

Q.  Did he tell you about any other crimes
besides the shooting?

A.  No.

Even if the trier of fact believed Liggins, his testimony established neither that Williams was in the apartment where Griffin was killed nor that a robbery occurred.

Simply put, we cannot conclude beyond a reasonable doubt that, had the trial judge not considered Harris' confession, he

would nonetheless have convicted Williams of the murder of Griffin in the commission of robbery. The effect of Harris' confession, inculpating Williams, on a trier of fact's view of the entirety of the evidence cannot be overstated. When the issue is "the potential for harm caused by the erroneous admission of evidence which tends to support the [fact finder's] credibility determination[,] . . . we must presume that such evidence had the potential to influence the [fact finder] into accepting the properly admitted evidence as more credible and, thus, to taint the [fact finder's] determination of the facts." Lilly, 258 Va. at 553, 523 S.E.2d at 210. Evidence which the trier of fact would normally hold as not credible or inconclusive can suddenly become convincing when corroborated by the accusatory confession of one who was intimately involved in the execution of the crime. Indeed, during the Commonwealth's closing argument, the trial judge noted that after he heard the testimony of Keene, Carter, and Liggins, which occurred before the Commonwealth introduced Harris' confession, the trial judge had written in his notes, "no robbery proved yet." The prejudicial impact of Harris' confession clearly was significant and undermines confidence in the verdict. In view of the generalized nature of the other testimony, we cannot conclude "beyond a reasonable doubt that the [improperly admitted confession] did not contribute to the verdict obtained." Chapman, 386 U.S. at 24. Thus, the Commonwealth has failed to

prove beyond a reasonable doubt that the improperly admitted evidence was harmless.  Therefore, we reverse the convictions and remand for retrial if the Commonwealth be so advised.

<u>Reversed and remanded.</u>