COURT OF APPEALS OF VIRGINIA

Present: Judges Annunziata, Humphreys and Senior Judge Coleman
Argued at Richmond, Virginia


MUSA A. PARROTT

                          MEMORANDUM OPINION[*] BY
v.    Record No. 1014-99-2       JUDGE ROBERT J. HUMPHREYS
                            MAY 15, 2001
COMMONWEALTH OF VIRGINIA


      FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
            James F. D'Alton, Jr., Judge

      (Phillip T. DiStanislao, Jr.; Hardy &
      DiStanislao, P.C., on brief), for appellant.
      Appellant submitting on brief.

      John H. McLees, Jr., Senior Assistant
      Attorney General (Mark L. Earley, Attorney
      General, on brief), for appellee.


    Musa Parrott appeals his conviction, after a jury trial, of first degree murder, attempted murder, and use of a firearm in the commission of the crimes. Parrott contends that the trial court erred in finding the evidence sufficient to convict him and that it erred in allowing a statement made to police by a witness to be read into evidence, after the witness had invoked his Fifth Amendment privilege, thereby violating Parrott's Sixth Amendment right to confront the witness.

---

    [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I.  Background

"On appellate review, we examine the evidence in the light most favorable to the Commonwealth, and we may not disturb the jury's verdict unless it is plainly wrong or without evidence to support it." Ashby v. Commonwealth, 33 Va. App. 540, 548, 535 S.E.2d 182, 186-87 (2000).

So viewed, the evidence presented at trial established that witness Daniel Harris was in the Green Lantern restaurant and bar in the early morning hours of February 21, 1997. He was there with his friend, William Parham. When the two entered the building, Harris entered first and stepped toward the bar, where he faced "the middle of the club, the center of the club where [he could] see everything." There were over 100 people in the club at the time.

Harris immediately noticed a gentleman in the middle of the room, standing with his back to him, make a pulling motion with his right hand from the side of his waist area and raise his hand "turning to the side." Harris then heard four gunshots and saw a "muzzle flash." The gunman stated, "Everybody get out of my way. I mean everybody."

Another man, who was with the gunman, began "pushing people out of the way to go out the door. And the gentleman that fired the shots turned and started running." As the gunman ran toward the door, he tripped on a chair. When he stood up, he was "face-to-face" with Harris. He pointed the gun at Harris and

-

said, "Didn't I say everybody get out of my way?"  He then pulled the trigger.  The gun made a clicking noise, but did not fire, and the gunman ran out of the bar.

After a few moments, Harris realized that someone in the bar had been shot.  He collected himself.  Then, he and Parham stepped out of the bar and saw the gunman and his companion get into a "little red car" and drive away.  The gunman was driving, and the companion was in the passenger seat.  Harris and Parham followed the car in Parham's Honda.  They followed for several blocks, but the gunman's companion began shooting at them and they eventually lost sight of the red car.

Several months later, Parrott was arrested for the murder of Kiel Alston, the man who had been shot and killed in the Green Lantern on February 21, 1997.[1]  At trial, the medical examiner testified that Alston had been shot four times.[2]  However, only two bullets and a bullet fragment were recovered from Alston's body.

The detective who investigated the scene testified that he found "two bullets" at the Green Lantern.  One was lodged in the

---

[1] At trial, Harris testified that he had grown up with Alston and had been friends with Alston and his family.

[2] The wounds were in the area of Alston's chest and abdomen. Two of the wounds appeared to be the result of gunshots from close range.

-

ceiling and one was lodged in the floor.[3]  He also found Alston's

coat lying on a chair, next to where he had been shot.

Upon searching the apartment where Parrott was living,

police found a "six-shot revolver" and bullets that were

consistent with the type used in the shooting.[4]  The police also

found a notebook, which Parrott stated was his "songbook," that

contained a letter/song dated "3/20/97" which read as follows:

> yes me set up a plan, day pon me motion, And
> here comes this man, want step ina me way,
> want fe dis I man, Just me and Rudeboy ina
> they club we a jam, everything start, From
> wha on one omen, Rudeboy till nine fe chill
> tru him Know how me stand, they boy don't

[3] Parrott alleges that there were actually six gunshots,
instead of four, as Harris testified.  By implication, Parrott
argues that Harris's testimony was inaccurate and that the
gunman must have known that the gun had no bullets left in it
when he pointed the gun at Harris and pulled the trigger.
In support of this, Parrott states that the medical
examiner testified four bullets were recovered from Alston's
body.  He further notes that the detective who investigated the
scene testified that he could account for the recovery of six
bullets, four from the body of the deceased and two from the
crime scene.  However, Parrott misstates the evidence.  The
medical examiner testified that she recovered only two bullets
and one fragment from the body of the victim.  The autopsy
report supports her testimony.  Furthermore, the detective
merely testified that he had recovered two bullets from the
scene and that there "should be four on the medical autopsy
report."  Despite the detective's testimony, the autopsy report
establishes that only two bullets and one fragment were
recovered from the victim.

[4] The firearms expert was unable to positively identify the
revolver as the murder weapon because the barrel had been
tampered with, or "gouged," causing the "land and groove"
impressions that would be imprinted on bullets shot from the
weapon to be altered.

-

know we flex don't even know fe we gang, him
a laugh after we tru we favor.  Sampletons
they, boy a fool him never know fe we
intention, by that time me ready fe kill
someone, so the boy rush me and grab, like
say me like a man, hold from they waste, a
Seddam him try slam, one shot ina him heart,
push him off with me hand, take two steps
back, than finish they battleman, from me
lick one shot Rudeboy done understand him
pop off him gun, clear they way fe Seddam,
me a run and push with me gun ina me hand,
run jump ina the car, pon they gas me just
slam.  two pussy ina Honda try fe follow
they Don, Rudeboy popoff, fe him gun just
Jam, so me think me a Driver, show hope they
can hang, take two corner, and them fire
shot after man, but me gone, can't stay,
time fe make a new plan.  Once I look and
see what things become to be with me gun ina
me hand, Its time fe me fe just flee, to the
hill, and just go on, relaxe and chill, sick
a tired of the world, tired fe see the blood
spill,

By:  Saddam[5]

    After being taken to the police station and read his

Miranda rights, Parrott was interviewed about the murder.

Parrott first stated that the gun found in his home was his, but

that he had loaned it to "a guy named Sheeke" for two days at

the beginning of the year, and that he did not ask Sheeke what

he had done with it.  After being told by the detective that the

gun was being sent to the lab, Parrott said that Sheeke told him

he had shot a man in the Green Lantern.  Parrott first stated

---

[5] We have included each of the spelling and grammatical
errors as they are written in Parrott's letter.

-

that he didn't know where Sheeke lived.  Later, Parrott stated he thought Sheeke lived on River Road Terrace.  Finally, Parrott stated that Sheeke's name was "Paul Donaldson" and that he lived in Baltimore but had an apartment on River Road Terrace where he sold marijuana.

After further questioning, Parrott confessed he knew about the shooting and conceded that he was in the bar that evening. He stated that Sheeke was talking to a girl and that Alston, who was drunk, said, "Don't talk to this girl.  This is my -- my boy's sister."  Sheeke said, "All right man," and told Alston to leave him alone.  Alston then took his coat off, picked up a beer bottle and attempted to hit Sheeke.  Parrott said he "was scared" and ran, and "Sheeke shot him."

Parrott said that after the shooting, he and Sheeke ran to the car Parrott had been driving, his girlfriend's red Ford Aspire, and drove away.  He stated that he drove and that Sheeke rode in the passenger seat.  Parrott stated that they had indeed been followed by two men in a Honda and that Sheeke had shot at the Honda from the passenger seat of the car.

During Parrott's interview, police were also interviewing a friend of Parrott's, Daron Brown.  After being misled by detectives and told that Parrott had placed him at the Green Lantern that evening, Brown gave a statement implicating Parrott as the gunman.  Brown indicated that he was Parrott's companion that evening and corroborated the story about the fight

-

occurring over a girl, as well as his actions in clearing the way for Parrott to get out and the escape and chase by the two men in the Honda.

At trial, Parrott's ex-girlfriend, Reesha Allen, testified that she was the owner of the red Ford Aspire and that she often loaned it to Parrott to drive. She also testified that Parrott went by the street names of "Don" and "Saddam" and that his friend Daron Brown went by the street name "Rude Boy."

Harris, who had earlier identified Parrott as the shooter in a photographic lineup, made an in-court identification of Parrott as the gunman. The Commonwealth also called Brown as a witness; however, Brown pled the Fifth Amendment and refused to answer questions. The Commonwealth therefore sought to admit the statement Brown had made to police as a statement "against penal interest," an exception to the hearsay rule. Over Parrott's objection, contending that the statement was not truly made "against penal interest," the trial court admitted the statement, finding that the witness was "unavailable" and that his statement otherwise met the requirements of the penal interest exception.

Parrott was ultimately convicted of all four charges and sentenced to a total of sixty-eight years in the Virginia state penitentiary.

-

## II.  Analysis

We first note that whether evidence is admissible falls within the broad discretion of the trial court, and the court's ruling will not be disturbed on appeal absent an abuse of discretion.  See Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 841 (1988).  By definition, when the trial court makes an error of law, an abuse of discretion occurs.  See Taylor v. Commonwealth, 28 Va. App. 1, 9, 502 S.E.2d 113, 117 (1998) (en banc).

The Commonwealth concedes that the trial court erred in admitting Brown's statement.  In Lilly v. Virginia, 527 U.S. 116 (1999), which was decided after the trial of this matter, the United States Supreme Court held that the admission of an accomplice's confession is a violation of a defendant's constitutional right to confrontation, unless "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." Id. at 134 (citation omitted).  No argument is made that such circumstances are present here.

Nevertheless, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."  Dearing v. Commonwealth, 259 Va. 117, 123, 524 S.E.2d 121, 125 (2000) (citation omitted).

-

> Although Confrontation Clause error is of constitutional magnitude, it is subject to harmless error analysis. Constitutional error is harmless . . . only if the beneficiary of the constitutional error . . . prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. The test, therefore, is not whether laying aside the erroneously admitted evidence there was other evidence sufficient to convict beyond a reasonable doubt . . ., but, more stringently, whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. In other words, even if the other evidence amply supports the . . . verdicts, [error is not harmless when] the disputed testimony may well have affected the . . . decision.

Williams v. Commonwealth, 32 Va. App. 395, 399-400, 528 S.E.2d 166, 168-69 (2000) (citations omitted).

With regard to the charge of first degree murder, Code § 18.2-32 provides that "[m]urder . . . by any willful, deliberate, and premeditated killing . . . is murder of the first degree . . . . Malice, an essential element of all grades of murder, distinguishes murder from manslaughter." Rhodes v. Commonwealth, 238 Va. 480, 485, 384 S.E.2d 95, 98 (1989) (citations omitted).

To sustain a conviction for attempted murder, the evidence must establish a specific intent to kill the victim, as well as an overt but ineffectual act committed in furtherance of this criminal purpose. See Hargrave v. Commonwealth, 214 Va. 436, 437, 201 S.E.2d 597, 598 (1974).

-

Finally, to convict an accused of violating Code § 18.2-53.1, the Commonwealth must prove that the accused actually had a firearm in his possession and that he used or attempted to use the firearm, or displayed the firearm in a threatening manner, while committing or attempting to commit one of the specified felonies, which include murder.  See Yarborough v. Commonwealth, 247 Va. 215, 218, 441 S.E.2d 342, 344 (1994).

Here, it is clear that Brown's statement was not important to the Commonwealth's case.  At most, it was cumulative of the evidence already solicited from Harris, Parrott's own statement to the police, and the evidence found in Parrott's home.  In fact, even excluding Brown's statement, the evidence overwhelmingly proved that Parrott was guilty of the crimes charged.

Thus, we conclude that although the admission of Brown's statement compromised Parrott's right of confrontation, the error, under the circumstances of this case, was harmless beyond a reasonable doubt.  Furthermore, in light of our holding in this regard, we find no merit in Parrott's argument that the evidence was insufficient to support his convictions.

Affirmed.

-