COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Lemons
Argued at Norfolk, Virginia


FRED BYRON GILBERT
                                          OPINION BY
v.  Record No. 2527-97-1         JUDGE JAMES W. BENTON, JR.
                                       NOVEMBER 10, 1998
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF ISLE OF WIGHT COUNTY
                      E. Everett Bagnell, Judge

           W. Alan Maust for appellant.

           Daniel J. Munroe, Assistant Attorney General
           (Mark L. Earley, Attorney General, on brief),
           for appellee.



     Fred Byron Gilbert was indicted and tried for the murder of

Perry Buchanan and use of a firearm in the commission of murder.

 The trial judge convicted Gilbert of voluntary manslaughter.  On

appeal, Gilbert contends the trial judge erred in ruling that the

evidence (1) was insufficient to prove self-defense and (2) was

sufficient to support a conviction of voluntary manslaughter.

Because we conclude that the evidence supports Gilbert's claim of

self-defense, we reverse his conviction.

                              I.

     In the Commonwealth's case-in-chief, the evidence proved

Perry Buchanan went to a restaurant at night accompanied by his

brother, his six-year-old daughter, and his friend, Felton

Benton.  Benton, the only person in that group who was a witness

at trial, testified that he and the Buchanan brothers drank

whiskey at Benton's house earlier that evening from 6:00 p.m.

until 9:00 p.m.  After Buchanan and his brother drank beer at the restaurant, Buchanan said, "I've got to go down the road . . . and tend to a little business."  Buchanan then took the group to a house in the country.

Benton testified that he had not previously met Gilbert and was unable to describe the homeowner who invited them to enter. Benton said he toured the house with the homeowner and then watched television with Buchanan's daughter.  Benton testified that while the homeowner and the Buchanan brothers were drinking at a bar in the room, he fell asleep on the couch.  He was awakened by a gunshot.  When he saw Buchanan lying on the floor, he woke Buchanan's brother.  Benton also claimed that he saw someone standing momentarily at the front door, but he could not identify that person.  He further testified that Buchanan's six-year-old daughter telephoned the police.

Deputy Sheriff James Garrett was dispatched to Gilbert's house.  He testified that the dispatcher's report stated the telephone call came from Gilbert, not the six-year-old child. When the deputy sheriff arrived at Gilbert's house at 11:40 p.m., Gilbert staggered to the front door covered in blood.  Gilbert was bleeding from his head, was bruised on his stomach and shoulder, and had various scratches on his body.  After the deputy sheriff persuaded Gilbert to lie on the ground, the deputy sheriff entered the house and saw Buchanan lying on the floor and bleeding from his legs.  The deputy sheriff testified that

- 2 -

Buchanan's brother and Benton were very intoxicated and were standing around Buchanan.  Buchanan's six-year-old daughter was also in the room.  Benton told the deputy sheriff that he had been asleep and did not know what happened.

When the deputy sheriff questioned Gilbert, Gilbert said he had been in a fight, that Buchanan and his brother beat and kicked him to the floor, and that he retrieved his gun and shot Buchanan.  The deputy sheriff observed a trail of blood "going from the living, dining room area . . . down the hallway toward the bedrooms."  He found blood in Gilbert's bedroom.  The deputy sheriff also testified that more than eighteen metal staples were used to close Gilbert's head wound and that Gilbert gave him "a pair of vice grips" that had been used to beat Gilbert.

After Gilbert was treated for his injuries, the deputy sheriff again spoke with Gilbert and wrote the following statement:

> Before being arrested, Fred Gilbert said that he feared for his life that he remembered being hit by [Buchanan's brother], he thinks, and that he was on the ground and they were kicking him.  He remembers someone saying we ought to kill the son of a bitch.  He also said he was in the bathroom bleeding and he thought about all the knives he has thinking they might kill him.  He said he went to his bedroom and got the gun from between the mattresses.  He didn't say anything else.

The medical examiner's report indicates that one bullet entered both of Buchanan's legs and severed an artery.  When Buchanan arrived at the hospital, his blood ethanol level was

".23% ethanol by weight by volume." The report also stated that Buchanan died from complications of shock caused by a massive hemorrhage from an artery in his left thigh that was severed by a bullet.

In analyzing Gilbert's self-defense argument, the trial judge accepted Gilbert's version of the events. Gilbert testified that he knew Buchanan and that he had spoken to Buchanan at the restaurant the night of the incident. Buchanan asked if Gilbert had alcoholic beverages at home and if they could drink at Gilbert's house. Gilbert agreed. Buchanan, his brother, his daughter, and Benton later arrived at Gilbert's house "out in the country." Gilbert had not previously known Benton and had once met Buchanan's brother.

Gilbert testified that he, the Buchanan brothers, and Benton stood around a breakfast bar, which divided the kitchen from the living room. They were drinking whiskey and playing a game of hand strength with "vice grips." Buchanan's daughter watched television. When Gilbert won the game, Buchanan's brother struck him on the head with one of the vice grips, causing him to fall to the floor and lose consciousness. As Gilbert regained consciousness and tried to rise, Buchanan and his brother punched and kicked Gilbert until he again fell to the floor. While he was on the floor, Gilbert heard one of the brothers say, "we ought to kill the son of a bitch." At that time, Gilbert could not account for Benton's presence.

When Buchanan and his brother turned away, Gilbert could barely walk and moved to an adjacent bathroom where he noticed that he had suffered an open wound to his head. Concerned that the brothers might find his hunting knives and aware that his house was isolated in the country, Gilbert went to his bedroom and retrieved a gun from under his mattress. Gilbert testified that he knew Buchanan and his brother had reputations for violence.

Gilbert came from the bedroom and told the brothers "to get the hell out of [his] house." Gilbert testified that, as he held his gun pointing to the floor, Buchanan and his brother looked surprised and initially did not move. Benton, who was then sitting on a couch with Buchanan's daughter, held her after she began screaming and crying. When Gilbert repeated his demand that they leave, Buchanan, who was standing five or six feet away from Gilbert, "made a move" toward Gilbert. Gilbert fired his gun, aiming "low" so as to "scare [Buchanan]." The bullet struck Buchanan in the leg, causing him to fall to the floor. Gilbert then telephoned the police. He confirmed the deputy sheriff's testimony that he, the Buchanan brothers, and Benton were intoxicated.

The evidence also proved that the Commonwealth prosecuted Buchanan's brother for maiming Gilbert. Gilbert testified for the Commonwealth in that prosecution. However, prior to Gilbert's trial, Buchanan's brother died of causes unrelated to

this incident.

At the conclusion of the evidence, the trial judge found that Gilbert was not at fault in the confrontation.  The trial judge accepted as fact that Gilbert was hit on the head, receiving a laceration that "was no small injury," and that Gilbert's bruises substantiated Gilbert's testimony that he had been kicked and beaten.  The trial judge also noted that "[a]t one point if [Gilbert] had pulled out a gun and shot [Buchanan] it may well have been self-defense because [Gilbert] did suffer a substantial beating."  However, the trial judge concluded that after Gilbert was able to exit the fray and leave the room, he was not privileged to return with a gun and shoot Buchanan, even after "one of the Buchanans made a move toward him."

## II.

An accused who claims self-defense to a charge of homicide "implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the mind[] of the [trier of fact]."  McGhee v. Commonwealth, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978).  The Supreme Court summarized the principles of self-defense by noting the following:

> The law of self-defense is the law of necessity . . . .  [A] defendant must reasonably fear death or serious bodily harm to himself at the hands of his victim.  It is not essential to the right of self-defense that the danger should in fact exist.  If it reasonably appears to a defendant that the danger exists, he has the right to defend against it to the same extent, and under the

- 6 -

same rules, as would obtain in case the danger is real.  A defendant may always act upon reasonable appearance of danger, and whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted.  These ancient and well-established principles . . .

emphasize the subjective nature of the
defense, and why it is an affirmative one.

Id.

The distinction between justifiable and excusable
self-defense claims is well established.  "Justifiable homicide
in self-defense occurs where a person, without any fault on his
part in provoking or bringing on the difficulty, kills another
under reasonable apprehension of death or great bodily harm to
himself."  Bailey v. Commonwealth, 200 Va. 92, 96, 104 S.E.2d 28,
31 (1958).  When the accused is free from fault in bringing on
the fray, the accused "need not retreat, but is permitted to
stand his [or her] ground and repel the attack by force,
including deadly force, if it is necessary."  Foote v.
Commonwealth, 11 Va. App. 61, 67, 396 S.E.2d 851, 855 (1990).

"Excusable homicide in self-defense occurs where the
accused, although in some fault in the first instance in
provoking or bringing on the difficulty, when attacked retreats
as far as possible, announces his desire for peace, and kills his
adversary from a reasonably apparent necessity to preserve his
own life or save himself from great bodily harm."  Bailey, 200
Va. at 96, 104 S.E.2d at 31.  If a killing is proved to be either
justifiable or excusable, the accused must be acquitted.  Id.

Gilbert contends he did not provoke the difficulty and
"kill[ed] upon reasonable apprehension of death or great bodily
injury to himself."  The Commonwealth argues that Gilbert's claim
of self-defense was defective because he had not "retreated as

- 8 -

far as possible, announced his desire for peace and then shot his weapon only to preserve his own life."

The Commonwealth, as did the trial judge, misperceived the nature of the defense. Only if Gilbert's shooting of Buchanan was excusable, and not justifiable, was Gilbert under a duty to retreat as far as possible before shooting Buchanan. The trial judge found and the evidence proved, however, that Gilbert was not at fault in inviting the Buchanans to his house for drinks. Indeed, no evidence proved Gilbert was at fault in bringing on the fray. The fact that Gilbert had "been drinking [whiskey with the Buchanan brothers prior to the assault upon him] does not ipso facto deprive him of the right of self-defense." Hawkins v. Commonwealth, 160 Va. 935, 941, 169 S.E. 558, 560 (1933).

Long ago the Supreme Court noted that "'a [person] is not obliged to retreat if assaulted in his [or her] dwelling, but may use such means as are absolutely necessary to repel the assailant from his [or her] house . . . even to the taking of life.'" Fortune v. Commonwealth, 133 Va. 669, 687, 112 S.E. 861, 867 (1922) (citation omitted). In assessing the means that Gilbert used, we note the "fundamental doctrine that a person who has been threatened with death or serious bodily harm and has reasonable grounds to believe that such threats will be carried into execution, has the right to arm himself [or herself] in order to combat such an emergency." Bevley v. Commonwealth, 185 Va. 210, 215, 38 S.E.2d 331, 333 (1946). See also Pike v.

Commonwealth, 24 Va. App. 373, 375, 482 S.E.2d 839, 840 (1997) (noting that "[t]he common law in this state has long recognized the right of a landowner to order a trespasser to leave, and if the trespasser refuses to go, to employ proper force to expel him").

Gilbert suffered a brutal and unprovoked attack in his home and reasonably feared for his safety. The attack occurred late at night in an isolated, rural area. Gilbert testified that he "could barely walk" after he was beaten and kicked and that his attackers openly suggested killing him. The testimony by the deputy sheriff and Gilbert concerning Buchanan's reputation for violence support Gilbert's claim of "reasonable apprehension . . . and . . . the likelihood of [Buchanan's] aggressive behavior." Edwards v. Commonwealth, 10 Va. App. 140, 142, 390 S.E.2d 204, 206 (1990). This evidence, which the trial judge accepted, proved that Gilbert reasonably feared death or serious bodily harm "at the time of the shooting," Taylor v. Commonwealth, 185 Va. 224, 227-28, 38 S.E.2d 440, 441 (1946), that after Gilbert ordered Buchanan to leave Buchanan made "some overt act indicative of imminent danger to [Gilbert] at the time," Harper v. Commonwealth, 196 Va. 723, 733, 85 S.E.2d 249, 255 (1955), and that "the amount of force used [was] reasonable in relation to the harm threatened." Diffendal v. Commonwealth, 8 Va. App. 417, 421, 382 S.E.2d 24, 26 (1989).

Gilbert properly raised the claim of justifiable

self-defense.  An accused who acts in self-defense is entitled to an acquittal.  <u>Bailey</u>, 200 Va. at 96, 104 S.E.2d at 31.  Because Gilbert introduced evidence of justifiable self-defense sufficient to raise a reasonable doubt as to his guilt, we reverse the judgment.

<u>Reversed and dismissed</u>.