COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Senior Judge Coleman
Argued at Alexandria, Virginia


ALLEN DERRICK SHELER
                                          OPINION BY
v.   Record No. 2424-00-4      JUDGE ROSEMARIE ANNUNZIATA
                                          JULY 9, 2002
COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                   Donald M. Haddock, Judge

        Joan C. Ruff (J. Amy Dillard, Deputy Public
        Defender, on brief), for appellant.

        Marla Graff Decker, Assistant Attorney
        General (Mark L. Earley, Attorney General, on
        brief), for appellee.


     Allen Derrick Sheler appeals his conviction by a jury for

robbery, abduction with the intent to extort pecuniary benefit,

and use of a firearm while committing robbery and abduction.

Sheler contends that the trial court erroneously denied his

motion to suppress evidence of glass fragments found on one of

Sheler's shoes.  For the reasons that follow, we reverse and

remand.

                             I.

                         BACKGROUND

     Under accepted principles, we review the evidence in the

light most favorable to the Commonwealth, the party prevailing

below.  Great Eastern Resort Corp. v. Gordon, 31 Va. App. 608,

610, 525 S.E.2d 55, 56 (2000).  At about 8:00 a.m. on December 27, 1998, two men wearing masks and gloves robbed a Wendy's restaurant located on South Van Dorn Street in Alexandria, Virginia.  The men gained entry by breaking the glass in two separate doors of the establishment.  The restaurant was not yet open for business, and three employees were inside, Elsy Benitez, Sunvil Dwived, and Mohamed Yousef.

One of the intruders carried a handgun wrapped in cloth. The taller of the two men held the gun and used it in a threatening manner, demanding that Yousef open the safe.  Once the safe was open, the shorter robber placed the money from the safe in a french fries box.  The employees were ordered into a freezer, where they were instructed to remain while the robbers fled.  When the employees came out of the freezer about ten to fifteen minutes later, Yousef called the police from a public telephone outside the building because the line in his office had been disconnected.

Joseph Fisher, a firefighter and former private investigator who was at a nearby ATM at the time of the incident, saw Sheler's vehicle at the Wendy's restaurant about the time of the robbery/abduction.  He wrote down the vehicle's license plate number after observing suspicious conduct around the vehicle.  The vehicle, a 1997 Plymouth Neon, was registered to Sheler.  When the police traced the vehicle back to Sheler,

they discovered that he had reported the vehicle stolen that day.

The morning of the robbery/abduction, Detective Durkin spoke with Sheler's parents and told them he was investigating a robbery and needed to speak with Sheler concerning the fact that his car may have been involved in the crime. Durkin asked Sheler's parents to telephone him if they learned his whereabouts.

The police were advised that Sheler was at the home of a friend in Prince Georges County, Maryland. About five hours after the crimes had been committed, Durkin, accompanied by two other officers, went to the residence. Two officers in uniform from Prince Georges County, Maryland were already at the residence, at Durkin's request, for jurisdictional purposes. The Maryland officers did not draw their guns.

Officer Durkin knocked on the door. The Maryland officers waited outside the residence. The Alexandria officers entered the home and found Sheler sitting in the living room wearing blue jeans and dark colored sneakers. Sheler's general appearance was consistent with that of one of the robbers. Durkin identified himself, displayed his badge, and told Sheler that they wanted to ask some questions about his car. He said he "would like [Sheler] to come back to Virginia where [they] could take a statement" from him. Neither Officer Durkin nor the other Alexandria officers drew their weapons or mentioned

- 3 -

the robbery. Sheler said, "okay," and accompanied the officers to the Alexandria police station. The officers did not touch Sheler or use a harsh tone or profanity.

The officers neither told him he did not have to come nor that he had to accompany them. On the way to the station, Sheler sat in the back seat of the police car along with one of the three Alexandria officers. He was not handcuffed.

During the interview at the station, Durkin asked to see Sheler's shoes because he believed that the robbers had likely walked through broken glass from the glass doors broken at the crime scene and that they had picked up glass fragments on the soles of their shoes. Sheler testified that Detective Durkin told him that he had glass on the bottom of his shoes and then told him to take off his shoes. Durkin testified that he did not see the glass fragments until Sheler took off his shoes. Specifically, Durkin "asked [Sheler] if [Durkin] could look at [Sheler's] shoes." In response, Sheler "kicked them off his feet and [Durkin] picked them up and looked at them." Durkin saw that there were glass fragments on the sole of one of Sheler's shoes and therefore seized them. He then seized Sheler's blue jeans so that they too could be inspected for glass fragments. The police took Sheler home after the interview.

The police later obtained a search warrant and searched Sheler's car. They found and seized additional glass samples

- 4 -

and a paper bag from Wendy's containing a corner of a $20 bill, a CD, and a variety of latent prints, one of which was that of Sheler.

The glass particles acquired as a result of the seizure of Sheler's shoes and pants were admitted into evidence over his objection. A forensic science supervisor with the Division of Forensic Science Crime Laboratory compared the optical and physical properties of the glass found on Sheler's shoes and pants with the glass recovered from the doors of the Wendy's restaurant. He testified that three particles of glass recovered from Sheler's shoes and two particles of glass from Sheler's pants were consistent with the properties of glass found in the door of the restaurant.

The trial court held that no illegal search or seizure occurred and, therefore, denied Sheler's motion to suppress the evidence of the glass fragments. It is from this ruling that Sheler now appeals.

## II.

### ANALYSIS

On appeal, Sheler contends the trial court erred in denying his motion to suppress the glass fragments because: 1) the fragments found on the sole of Sheler's shoe and his clothes were the fruit of an unlawful seizure of his person; and 2) the fragments were the fruit of an unlawful search and seizure of Sheler's shoes. Although we find that the seizure of Sheler's

- 5 -

person was lawful, we reverse on the ground that the police unlawfully searched Sheler's shoes.

In reviewing the trial court's denial of a motion to suppress on appeal, we will review the evidence and all reasonable inferences arising from it in the light most favorable to the Commonwealth, the party prevailing below. Dickerson v. Commonwealth, 35 Va. App. 172, 543 S.E.2d 623 (2001). The burden to show that the denial of the motion to suppress constituted reversible error rests with the defendant. Motley v. Commonwealth, 17 Va. App. 439, 440-41, 437 S.E.2d 232, 233 (1993).

## A. Legality of the Seizure

The trial court found that Sheler had voluntarily accompanied the police to the station and, thus, no unlawful arrest or seizure had occurred. We agree.

A person is seized within the meaning of the Fourth Amendment whenever there is a show of official authority such that a reasonable person would have believed that he was not free to terminate the encounter. Florida v. Royer, 460 U.S. 491 (1983) (plurality opinion) (citing United States v. Mendenhall, 446 U.S. 544, 554 (1980)); Moss v. Commonwealth, 7 Va. App. 305, 307, 373 S.E.2d 170, 171-72 (1988). An objective test determines whether a reasonable person would have believed himself or herself free to terminate the encounter "in view of all of the circumstances surrounding the incident." Mendenhall,

- 6 -

446 U.S. at 554; see also McGee v. Commonwealth, 25 Va. App. 193, 199-200, 487 S.E.2d 259, 262 (1997) (en banc).

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language, or tone of voice indicating that compliance with the officer's request might be compelled.

Mendenhall, 446 U.S. at 554; see Weathers v. Commonwealth, 32 Va. App. 652, 659, 529 S.E.2d 847, 850-51 (2000).

Sheler, relying on our decision in McGee, argues that the officers' "actions and words" conveyed the message that Sheler might be or might become a suspect and, therefore, constituted a show of official authority such that he did not feel free to leave. In McGee, we held that, "[w]hen the police expressly inform an individual that they have received information that the individual is engaging in criminal activity, the police 'convey a message that compliance with their requests is required.'" 25 Va. App. at 200, 487 S.E.2d at 262 (quoting Florida v. Bostick, 501 U.S. 429, 435 (1991)); see also Royer, 460 U.S. at 501 (finding a seizure where officers identified themselves as narcotics agents, told defendant that he was suspected of transporting narcotics, and asked him to accompany them to the police room while retaining his plane ticket and driver's license).

- 7 -

Sheler's reliance on McGee is misplaced. In McGee, the defendant was told that the officers had "received a call that [he] was on this corner selling drugs and [that he] matched the description." 25 Va. App. at 196, 487 S.E.2d at 260. We found that this statement conveyed an unmistakable message to McGee that the officers suspected he was selling drugs and that they were detaining him to investigate his activity. Id. In this case, the officer did not tell Sheler that he had been specifically identified as a suspect in a particular crime that the officer was investigating. Id. at 200, 487 S.E.2d at 262. Indeed, the record shows that Officer Durkin asked Sheler to come to the station to answer questions about his car and obtained his consent before mentioning the robbery.

The law is well settled that mere questioning by the police does not constitute a seizure. See Bostick, 501 U.S. at 434; Mendenhall, 446 U.S. at 553-54; Richards v. Commonwealth, 8 Va. App. 612, 615, 383 S.E.2d 268, 270 (1989). Consequently, where the police inform an individual that they are conducting a general investigation in response to a report, the encounter, without more, is not a seizure. McGee, 25 Va. App. at 199, 487 S.E.2d at 262; Royer, 460 U.S. at 497; Williams v. Commonwealth, 21 Va. App. 263, 266, 463 S.E.2d 679, 681 (1995).

Sheler also contends that the officers made a show of force because five officers were present who displayed their badges of

- 8 -

authority and entered his friend's home without permission. We disagree.

Considering the totality of the circumstances, we find that the encounter was unaccompanied by coercion or a show of force by the officers. Although several officers went to the house, only Durkin spoke with the defendant inside the residence. Durkin knocked on the door to the house, introduced himself to the person who opened the door and asked if the defendant was there. The person at the door "let [Durkin] in." None of the officers touched Sheler, blocked his path, used threatening or intimidating language or tone of voice, accused Sheler of a crime, or displayed their weapons. He was not handcuffed or otherwise placed in custody. While the record establishes that there were five officers present, this fact standing alone does not transform an encounter into a seizure. Cf. Watson v. Commonwealth, 19 Va. App. 659, 663, 454 S.E.2d 358, 361 (1995) (finding that mere presence of police, insufficient in itself to create a seizure, is sufficient to continue a seizure where police had previously handcuffed and restrained defendant).

Sheler testified that he believed he would be arrested if he did not accompany the officers to the Alexandria police station. Sheler explained that he did not feel free to leave because "if [he] didn't cooperate, [the officer] would start finding out that [he] did whatever."

- 9 -

It is worth noting that the test of whether a reasonable person would feel free to leave an encounter "presupposes an innocent person." Bostick, 501 U.S. at 429. Here, Sheler testified that he believed he would be arrested if he did not accompany the officers to the Alexandria police station. Sheler explained that he did not feel free to leave because "if [he] didn't cooperate, [the officer] would start finding out that [he] did whatever." Consequently, his subjective fear of arrest stemmed from his guilt, and not from police activity. Sheler admitted that the police told him only that they wanted to ask him questions about his car and that he agreed to go with them to the station. A reasonable, innocent person would not be so intimidated by an officer requesting to ask questions about his car that he would not feel free to leave. Because the police did not make a show of official authority such that a reasonable person would have believed he or she was not free to terminate the encounter, we find that Sheler was not seized within the meaning of the Fourth Amendment.

## B. Illegality of the Search

The trial court ruled that the search was lawful and admitted the evidence, finding that an individual has no reasonable expectation of privacy in the soles of his or her shoes.[1] Sheler maintains, however, that he had a reasonable

---

[1] Because the trial court limited its analysis of the lawfulness of the search to this legal conclusion, expressly

- 10 -

expectation of privacy in the sole of his shoe and that the glass fragments found on his shoe, and subsequently his pants, should therefore be suppressed as the fruit of an unlawful search.  We agree.

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV. Subject to several well established exceptions, warrantless searches of any place or thing in which a person has a reasonable expectation of privacy are unreasonable.  See Mincey v. Arizona, 437 U.S. 385, 390 (1978); Reittinger v. Commonwealth, 260 Va. 232, 235, 532 S.E.2d 25, 27 (2000). Because an unlawful "search compromises the individual interest in privacy," Horton v. California, 496 U.S. 128, 133 (1990), "the Commonwealth has the burden of proving the legitimacy of a warrantless search and seizure."  Simmons v. Commonwealth, 238

---

ruling that it made no findings "whether . . . taking the clothes [and the shoes] was voluntary or not," and, therefore, did not address or resolve factual matters that underlay the issue of consent, we do not reach the Commonwealth's contention that Sheler voluntarily consented to the search.  Stateren v. Montgomery Ward and Co., 234 Va. 303, 305-06, 362 S.E.2d 324, 326 (1987) (finding "right result wrong reason" rule inappropriate because the trial judge confined his decision to a different ground); Driscoll v. Commonwealth, 14 Va. App. 449, 452, 417 S.E.2d 312, 313-14 (1992) (noting that the right result wrong reason rule does not apply where "further factual resolution is needed before the right reason may be assigned to support the trial court's decision").

Va. 200, 204, 380 S.E.2d 656, 659 (1989).  On appeal, the trial court's legal conclusion concerning when, or whether, an illegal search occurred is reviewed de novo.  Archer v. Commonwealth, 26 Va. App. 1, 8, 492 S.E.2d 826, 830 (1997); McGee, 25 Va. App. at 198, 487 S.E.2d at 261; see Mendenhall, 446 U.S. at 552, 555.  However, the appellate court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and [it] give[s] due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  McGee, 25 Va. App. at 198, 487 S.E.2d at 261 (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)).

To determine whether an individual has a reasonable expectation of privacy in an item, we must give effect to "our societal understanding that certain areas deserve the most scrupulous protection from government invasion."  Oliver v. United States, 466 U.S. 170, 178 (1984).  The trial judge's ruling that a shoe constituted "areas of the outer apparel that is visible to the world" and that Sheler had no reasonable expectation of privacy in his shoes failed to give effect to this principle.

The mere fact that a person's clothing and shoes are visible to the public in some general way does not extinguish a person's constitutionally protected expectation of privacy in them.  See Katz v. United States, 389 U.S. 347, 351 (1967)

- 12 -

(finding that what one "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected").  Indeed, several of our sister jurisdictions have found that an individual has a reasonable expectation of privacy in the clothing he or she wears.  See, e.g., Evans v. State, 987 S.W.2d 741, 743 (Ark. App. 1999) (holding that "[a]n individual's expectation of privacy in a purse is probably greater than in any other property except the clothing worn by a person"); Samuel v. State, 895 S.W.2d 487, 489 (Tex. Ct. App. 1995) (holding that "a person has a reasonable expectation of privacy in the clothes he wears"); State v. Joyce, 639 A.2d 1007, 1013 (Conn. 1994) (holding that "generally there is a reasonable expectation of privacy in the clothes that one wears"); People v. Chernowas, 314 N.W.2d 505, 507 (Mich. App. 1982) (holding that "a defendant has a legitimate expectation of privacy in his person and clothing").

We find that an individual's expectation of privacy in his or her shoes is an interest that society is willing to accept as reasonable.  Generally, people do not expect other persons will seize the shoes or other garments they wear and manipulate them to explore and expose unseen features.  By seizing the shoe, the detective was able to manipulate the shoe and expose areas of the shoe not readily seen.  This conduct far exceeded the contact Sheler and other citizens might reasonably expect from the police or other members of the public.  The search in this

case was as intrusive as removing and searching a person's hat, blouse, skirt, or jacket because of a suspicion that a portion of the garment which is not exposed to the public's normal view contains a minute fragment of an incriminating substance.

Furthermore, Sheler exhibited a subjective expectation that the soles of his shoes remain free from close inspection. Bond v. United States, 529 U.S. 334, 338 (2000); Shaver v. Commonwealth, 30 Va. App. 789, 795, 520 S.E.2d 393, 396 (1999). He did not display the crevices of the soles of his shoes in any way or otherwise expose them to public scrutiny. Nothing in the record suggests that the small piece of glass in the sole of Sheler's shoe could have been seen by the public. The sole of Sheler's shoe did not proclaim its contents by "transparen[cy,] . . . distinctive configuration," or otherwise, so as to negate his reasonable expectation of privacy. United States v. Williams, 41 F.3d 192, 197 (4th Cir. 1994). Rather, the evidence proved that the detective only became aware of the glass because he asked Sheler "[t]o take [his shoe] off . . . so that [the detective] could look at the bottoms." The detective was able to discern "a little piece of glass in the sole of the shoe" only after seizing the shoe, turning the shoe over, and making close inspection of it. After he found the glass on Sheler's shoes, he seized his pants.

Because Sheler had a reasonable expectation of privacy in the object searched, the trial court erred in admitting the

- 14 -

glass fragments found as a result of that search and the subsequent search of his pants on that ground. Wong Sun v. United States, 371 U.S. 471, 484 (1963) (holding that evidence found as a direct or indirect result of an unconstitutional invasion must be excluded).

### C. Reversible Error

We find that the trial court's error is reversible. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). Chapman "requir[es] the beneficiary of the constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (citation omitted); see Bass v. Commonwealth, 31 Va. App. 373, 387, 523 S.E.2d 534, 541 (2000) (requiring appellate court to assess "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," to determine that a constitutional error was harmless beyond a reasonable doubt (citations omitted)).

In this case, the evidence that Sheler's pants and shoes contained glass fragments from the door the robbers broke to enter the store conclusively placed him at the scene of the crime and was thus probative of his identity as one of the robbers. The evidence buttressed the manager's testimony that, although he only "saw [the robber] briefly," he knew Sheler was

- 15 -

the robber.  See Williams v. Commonwealth, 32 Va. App. 395, 406,
528 S.E.2d 166, 171-72 (2000) (holding that testimony of one
witness which a trier of fact may have found inconclusive can
become very convincing when other evidence corroborates it).
Moreover, the other evidence of identity was not overwhelming.
Although Sheler's car was observed at the scene of the robbery,
his car had been reported stolen earlier that day.  The manager,
the only eyewitness able to describe more than the clothes,
race, and height of the robber, provided testimony that "raised
issues of credibility and, for that reason, cannot be considered
'overwhelming.'"  Cairns v. Commonwealth, 35 Va. App. 1, 16, 542
S.E.2d 771, 778 (2001).  A reasonable possibility exists,
therefore, that the unlawfully seized evidence contributed to
Sheler's conviction.  Therefore, the trial court's admission of
the illegally seized evidence was reversible error.
Accordingly, we reverse the judgment of the trial court and
remand for further proceedings, if the Commonwealth be so
advised.

Reversed and remanded.

Benton, J., concurring.

I concur in Parts I and II(B) and in the judgment reversing the convictions and remanding for a new trial.