COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Felton and Kelsey
Argued at Salem, Virginia


JEFFREY NEAL COLEMAN
                                              MEMORANDUM OPINION[*] BY
v.       Record No. 2676-02-3              JUDGE D. ARTHUR KELSEY
                                                NOVEMBER 18, 2003
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                          Porter R. Graves, Jr., Judge

         David B. Hargett (Hargett & Watson, PLC, on brief), for appellant.

         Kathleen B. Martin, Assistant Attorney General (Jerry W. Kilgore,
         Attorney General, on brief), for appellee.


        The appellant, Jeffrey Neal Coleman, claims the trial court erred by not suppressing

evidence seized during a search of a camper in which he claimed to have a reasonable

expectation of privacy. The trial court also erred, Coleman argues, by refusing jury instructions

that would have permitted the jury to conclude that he acted in self-defense when he opened fire

into a crowd during a drive-by shooting. Finding Coleman's arguments meritless, we affirm.

                                              I.

        On appeal, we review the evidence "in the light most favorable" to the Commonwealth.

Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003). That principle

requires us to "discard the evidence of the accused in conflict with that of the Commonwealth,

and regard as true all the credible evidence favorable to the Commonwealth and all fair

inferences that may be drawn therefrom." Kelly v. Commonwealth, 41 Va. App. 250, 254, 584

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

S.E.2d 444, 446 (2003) (*en banc*) (quoting Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998)) (internal quotation marks omitted).

Around 8:30 in the evening on May 11, 1998, Coleman met two men, Shawn Lewis and Donald D. Thomas, on Kelly Street in Harrisonburg to sell them marijuana. Coleman, who was accompanied by his wife and a friend, Wesley Tusing, handed the men small bags containing the marijuana. Without paying Coleman, both men "just took off running with it." Coleman and the others sat in the car for a few minutes, then drove to a house owned by a friend, Keith Trumbo. Inside Trumbo's house, Coleman retrieved a "single shot .22" that he placed in his car. After "a couple of hours," the three went to another location where Coleman retrieved a buried .30 caliber, semi-automatic assault rifle with a "flash suppressor" for nighttime use.[1] So armed, Coleman told the others that they "were going to talk to this dude that gave us a good deal earlier."

At approximately 11:00 that evening, Coleman, his wife, and Tusing returned to Harrisonburg. Coleman, high on marijuana and driving a different car than earlier, placed the assault rifle on "the driver's seat right beside him." Coleman and Tusing then picked up William Heflin, dropped off Coleman's wife, and went back to Kelly Street. Once there, Coleman parked the car and spotted a crowd of "probably 20 people" standing next to the street. A few minutes later, Coleman drove toward the crowd with his lights off and placed the assault rifle "up on the window and just started blasting," firing "12 to 15 rounds" in all. Coleman then "sped up" and quickly left Harrisonburg.

After briefly returning to Trumbo's house where Coleman's wife rejoined them, Coleman, his wife, and Tusing left and "went to some trailer up in the mountain." They arrived

---

[1] A flash suppressor is a "piece that goes on the end of the gun to make less flash when the fire shoots out the barrel."

at approximately 3:00 a.m. the next morning. The three waited at the camper and "stashed" both the .22 and the .30 caliber rifle. Four hours later they left the camper and returned to Trumbo's house, where the police met them and placed Coleman under arrest.

At the police station, Coleman confessed to the shooting. Claiming that he "didn't plan it," Coleman stated that he only "intended on getting my money back." He admitted firing "probably 10 times" at the men who had earlier stolen his marijuana. The shooting "all happened so fast," Coleman claimed. He stated that he saw "one of 'em that was running with the pot and that's when I started pulling the trigger."

Officer Al McDorman visited the camper at about 5:00 p.m. on May 12. Though a locked chain crossed the logging road that approached the camper, the camper did not have a mailbox, any "no trespassing signs," locks on the doors, or any signs indicating that the camper was on private property. McDorman announced his presence and, after hearing no reply, entered the camper without a warrant. Inside, McDorman found a bed with a bedspread, a kitchen table, and a Bible. Near the kitchen, McDorman found a pair of pants and a camouflage hat, while a camouflage jacket lay on the bed. Under the mattress, McDorman located a .22 rifle and, in drawers under the bed, a .30 caliber rifle. Ammunition for the .30 caliber rifle was located in a "small green bag" near the entrance to the camper.

Before trial, Coleman moved to suppress the evidence seized in the camper, claiming that McDorman's warrantless search of the premises violated his Fourth Amendment rights. At the suppression hearing, Betty Ritchie testified that she and her husband owned the land and gave her son permission to keep his "little camper" on the property. Mrs. Ritchie did not know Coleman and did not give him permission to be on the property or to use her son's camper. She understood that her son used the camper for hunting, camping, and cutting wood. The camper

was unlocked and "a lot" of people seemed to be in and out of it. Mrs. Ritchie maintained a locked cable across the road leading to the camper.

Her son, Anthony Ritchie, testified that he had occasionally allowed Coleman and "a bunch of people" to use the camper for "camping and to grill out." Anthony, however, "hadn't talked to [Coleman] for a while before this happened" and he "did not know he was staying up there at the time." Anthony said he never gave Coleman permission to "store guns" or "rifles" in the camper. Anthony also understood he did not "have the right to control who goes on that property." "It's not in my name," he explained. His parents, he said, nevertheless did not "care who I take up there."

The trial court denied the motion to suppress. Focusing both on Coleman's use of the camper at the time he stashed his assault rifle there and the timing of Officer McDorman's search ten hours later, the court found as a fact that "the defendant's own evidence shows that at the time they weren't living [there], they had not been given permission to store things there, that they were really just stopping by." For these reasons, the court held, Coleman did not have a "reasonable expectation of privacy in the premises" and thus could not assert a Fourth Amendment challenge to Officer McDorman's search of the camper.

Following the presentation of the evidence at trial, Coleman requested that the court instruct the jury that he acted in self-defense by shooting at the crowd on Kelly Street. Finding insufficient evidence to support Coleman's request, the trial court denied the proposed jury instruction. The jury found Coleman guilty of two counts of malicious wounding (Code § 18.2-51.2) and two counts of use of a firearm while committing a felony (Code § 18.2-53.1). The trial court then sentenced Coleman to 68 years in prison, with no time suspended. Coleman now appeals.

II.

Though the ultimate question whether an officer's conduct violated the Fourth Amendment triggers *de novo* scrutiny on appeal, the trial court's findings of historical fact bind us due to the weight we give to the inferences drawn from those facts by resident judges and local law enforcement officers. Jackson v. Commonwealth, 41 Va. App. 211, 222, 583 S.E.2d 780, 786 (2003) (*en banc*). Thus, we must give deference to the factual findings of the trial court and independently determine whether those findings satisfy the requirements of the Fourth Amendment. Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 450 (2003) (citation omitted).

In addition, the appellant must shoulder the burden of showing that the trial court's decision "constituted reversible error." McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*) (citations omitted). "Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts." Craddock v. Commonwealth, 40 Va. App. 539, 547, 580 S.E.2d 454, 458 (2003); Barkley v. Commonwealth, 39 Va. App. 682, 690, 576 S.E.2d 234, 238 (2003).

A.

To have standing to invoke the protections of the Fourth Amendment, a defendant must have a "legitimate expectation of privacy in the place searched." Megel v. Commonwealth, 262 Va. 531, 534, 551 S.E.2d 638, 640 (2001) (citing Minnesota v. Carter, 525 U.S. 83, 88 (1998), and Rakas v. Illinois, 439 U.S. 128, 143 (1978)); McCracken v. Commonwealth, 39 Va. App. 254, 260, 572 S.E.2d 493, 496 (2002) (*en banc*) (recognizing that one without a justifiable privacy expectation has "no standing to contest the entry of the house"). The legitimacy of this expectation depends not only on the person's subjective beliefs — society, too, must be "willing

to recognize that expectation as reasonable." Kyllo v. United States, 533 U.S. 27, 33 (2001) (quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

While it is often said that the Fourth Amendment "protects people, not places," Katz v. United States, 389 U.S. 347, 351 (1967), it is equally true that "the extent to which the Fourth Amendment protects people may depend upon where those people are," Carter, 525 U.S. at 88; see also Sheler v. Commonwealth, 38 Va. App. 465, 476, 566 S.E.2d 203, 208 (2002) ("[W]e must give effect to 'our societal understanding that certain areas deserve the most scrupulous protection from government invasion.'" (quoting Oliver v. United States, 466 U.S. 170, 178 (1984))). The protection of one's home, for example, is at the "very core" of the Fourth Amendment. Kyllo, 533 U.S. at 31. Closely related is the privacy interest of an "overnight guest." Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). But one "merely present with the consent of the householder" during a brief visit falls outside the privacy interests protected by the Fourth Amendment. Carter, 525 U.S. at 90.

That said, the Fourth Amendment draws few bright lines on this subject. Instead, it focuses on a combination of variables, including whether the individual "has a possessory interest" in the place searched, "whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." McCary v. Commonwealth, 36 Va. App. 27, 36, 548 S.E.2d 239, 243 (2001) (quoting McCoy v. Commonwealth, 2 Va. App. 309, 312, 343 S.E.2d 383, 385 (1986)) (internal quotation marks omitted).

The facts of this case support the trial court's conclusion that Coleman was, at best, a casual visitor to the camper for four hours during the early morning of May 12, 1998. Neither the landowner nor the camper owner knew Coleman was there. They had not given him

permission to store weapons in the camper. Coleman left the camper ten hours before Officer McDorman conducted his search at 5:00 p.m. that evening. No evidence suggests that, upon leaving the camper, Coleman intended to return (except, perhaps, at some undetermined date to retrieve his "stashed" assault rifle) or, for that matter, that he had any right at any time to exclude others from the camper. Though relevant, the trial court correctly reasoned, Coleman's use of the camper on prior occasions "doesn't really end the inquiry" because the focus must be on the defendant's use of the camper at the time of Officer McDorman's search. Accepting the trial court's findings of historical fact, we agree that at the time of the challenged search Coleman did not have a reasonable expectation of privacy in the camper sufficient to assert a Fourth Amendment claim.

B.

Coleman also argues that the trial court erred by not instructing the jury on his claim of self-defense. Because the requisite level of evidence does not support Coleman's proposed instructions, we affirm the trial court's decision to refuse them.

A trial court should instruct the jury, when requested to do so, "on all principles of law applicable to the pleadings and the evidence." Mouberry v. Commonwealth, 39 Va. App. 576, 582, 575 S.E.2d 567, 569 (2003) (quoting Dowdy v. Commonwealth, 220 Va. 114, 116, 255 S.E.2d 506, 508 (1979), and Taylor v. Commonwealth, 186 Va. 587, 592, 43 S.E.2d 906, 909 (1947)). Refusal to give an instruction supported by "more than a scintilla of evidence" constitutes reversible error. Rhodes v. Commonwealth, 41 Va. App. 195, 200, 583 S.E.2d 773, 775 (2003) (citing Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998)).

An "independent prerequisite" for a jury instruction, the scintilla test focuses on whether a factfinder could "rationally" accept the position advocated by the instruction's proponent. Carter v. United States, 530 U.S. 255, 261 n.3 (2000) (quoting Schmuck v. United States, 489

U.S. 705, 716 n.8 (1989)) (internal quotation marks omitted). On appeal, therefore, we review the record in the light most favorable to the proponent of the instruction. Waters v. Commonwealth, 39 Va. App. 72, 78, 569 S.E.2d 763, 766 (2002).

By raising a claim of self-defense, the defendant "implicitly admits" that his use of violence "was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors." Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001) (quoting McGhee v. Commonwealth, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978)). To succeed in this affirmative defense, the defendant must reasonably believe that defending himself was necessary to avoid "an imminent threatened harm" that could not be avoided through any other adequate means. Humphrey v. Commonwealth, 37 Va. App. 36, 49, 553 S.E.2d 546, 552 (2001) (quoting Buckley v. City of Falls Church, 7 Va. App. 32, 33, 371 S.E.2d 827, 827-28 (1988)).

To establish justifiable self-defense, the defendant must be "free from fault in bringing on the fray." Gilbert v. Commonwealth, 28 Va. App. 466, 472, 506 S.E.2d 543, 546 (1998). Indeed, "the accused must be without fault 'in the minutest degree.'" Roger D. Groot, Criminal Offenses and Defenses in Virginia 193 (5th ed. 2004) (citation omitted); see also Adams v. Commonwealth, 163 Va. 1053, 1058, 178 S.E. 29, 31 (1935); Hughes v. Commonwealth, 39 Va. App. 448, 464-65, 573 S.E.2d 324, 332 (2002).

If at fault, the defendant may still assert excusable self-defense if the evidence shows he abandoned the fight, retreated "*as far as he safely can*," but nonetheless found no other way to "preserve his life or save himself from great bodily harm." Dodson v. Commonwealth, 159 Va. 976, 979-80, 167 S.E. 260, 261 (1933) (emphasis in original) (paraphrasing Vaiden v. Commonwealth, 53 Va. (12 Gratt.) 717, 729 (1855)); see also Connell v. Commonwealth, 34 Va. App. 429, 437, 542 S.E.2d 49, 53 (2001) ("Once the accused abandons the attack and retreats as

far as he or she safely can, he or she may kill his or her adversary if there is 'a reasonably apparent necessity to preserve his [or her] own life or save himself [or herself] from great bodily harm.'" (quoting Bailey v. Commonwealth, 200 Va. 92, 96, 104 S.E.2d 28, 31 (1958))).

In this case, the defendant explained to police investigators his actions and underlying motivations this way:

> Q: Were you looking when you shot or were you looking straight ahead, driving, just . . . .
>
> A: Yeah. Exactly . . . well no, I don't know, it all happened so fast. *I seen one of 'em that was running with the pot and that's when I started pulling the trigger* and I guess I did start watching the road and it was over.
>
> \* \* \* \* \* \* \*
>
> Q: *Why* did you shoot?
>
> A: I seen one that stole my pot.
>
> Q: You saw the guy that stole you, that ripped you off, and did you just go off? Do you, do you have a problem with that sometimes?
>
> A: Yeah.
>
> Q: Do you have a bad temper?
>
> A: Oh yeah! It's like you push a button in me and all of a sudden you got uncontrollable rage when normally I'm a calm, thinking individual . . . .
>
> \* \* \* \* \* \* \*
>
> Q: That's the only thing that clicked that little button in you was a guy.
>
> A: Yeah.
>
> Q: that ripped you off.
>
> A: Yeah! Yeah! Yeah!

At trial, Coleman mentioned for the first time that he believed Shawn Lewis possessed a handgun and was preparing to use it against Coleman. Coleman admitted, however, he never actually saw the handgun before opening fire on Lewis and the crowd of bystanders. Coleman also provided no explanation for why he did not simply drive away if he feared Lewis might be armed.

Taken in the light most favorable to Coleman, the evidence could not lead a rational factfinder to conclude that Coleman was faultless or that he retreated from the alleged danger for purposes of establishing either justifiable or excusable self-defense. To settle a score from a failed drug transaction, Coleman obtained a loaded assault rifle fitted with a flash suppressor for nighttime shooting and hunted down his victim with the obvious intent to do harm. This whole time, Coleman admitted, his attitude was "if I had to shoot them, I was mad and I didn't really care, I would have." When he found his victim, Coleman "started blasting" his assault rifle out of an open car window into a crowd of twenty people. Though he claims his victim may have had a handgun, Coleman made no effort whatsoever to retreat from the alleged danger. Instead, he opened fire into a crowded sidewalk. "A man cannot go a-gunning for an adversary and kill him on the first appearance of resistance, and rely upon the necessity of the killing as an excuse therefor." Jordan v. Commonwealth, 219 Va. 852, 855-56, 252 S.E.2d 323, 325 (1979) (quoting Sims v. Commonwealth, 134 Va. 736, 760, 115 S.E. 382, 390 (1922)) (internal quotation marks omitted).

### III.

Accepting the facts in the light most favorable to the Commonwealth, Coleman failed to demonstrate a legitimate privacy interest in the camper. The trial court, therefore, did not err in denying his motion to suppress. Viewing the evidence in the light most favorable to Coleman,

he also failed to present a scintilla of evidence supporting the proffered self-defense instructions. As a result, the trial court correctly refused to instruct the jury on this affirmative defense.

<u>Affirmed.</u>