# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

v.

Marvin Hines

## Case No. CR11-3271

By Judge Mary Jane Hall

## April 7, 2014

The Court took this matter under advisement after a bench trial on March 24 and 25, 2014, in order to permit counsel to brief the law applicable to Defendant's claim of self-defense. The Court has received and reviewed the post-trial memorandum submitted by the Commonwealth and considered the evidence and argument of counsel. For the reasons stated herein, the Court finds that Defendant has not carried his burden of proving self-defense. The Court further finds that the Commonwealth has not carried its burden of proving either premeditation or malice. Accordingly, the Court finds the Defendant guilty of voluntary manslaughter, a lesser-included offense under the indictment.

### Findings of Fact

The victim Wayne Hudson had been the live-in boyfriend of Defendant's sister, Ruby Strange, for approximately fifteen years. He lived on the same street as Defendant, and the two of them spent much time in each other's company. When Defendant shot Mr. Hudson in the early hours of May 30, 2013, Mr. Hudson had been drinking since the afternoon of the previous day and was intoxicated. He had become extremely belligerent and argumentative, insisting that Mrs. Hines and neighbor Matt Thomas leave him alone and leave his girlfriend alone. Mr. Hudson's belligerent behavior caused alarm to Mrs. Hines. Mr. Thomas tried without success to get Mr. Hudson to calm down.

In the heat of this out-of-control temper tantrum happening in his own house, Defendant confronted Mr. Hudson. Defendant testified that he saw that Mr. Hudson had a gun in his hand. The Commonwealth hotly contests Defendant's testimony that the victim was armed and urges the Court to find otherwise. Defendant testified that upon his realization that this raging intoxicated man had a gun in his hand, he immediately retreated to an adjacent room, got a weapon of his own, and returned to the room. He testified that he planned to confront Mr. Hudson with his own weapon on the belief that Mr. Hudson would put his weapon down and would calm down once he realized that Defendant was armed. He testified to his concern for his wife and sister. Mr. Thomas saw Defendant pass by in the hallway on the way to rejoin Mr. Hudson with the gun in his hand. Defendant fired the gun approximately five times thereafter, causing three bullet wounds to Mr. Hudson that proved fatal. Mr. Thomas testified that he did not see Mr. Hudson with a gun. He admitted that he told the police on the day of the shooting that he thought Mr. Hudson had a gun.

Within just a few minutes after the shooting, Mr. Thomas went upstairs to speak to Defendant and, upon his return downstairs, saw Ms. Strange, Defendant's sister and the victim's partner, coming from the direction of the room occupied by Mr. Hudson, walking toward the front of the house, holding a gun. Mr. Thomas saw Ms. Strange go out the front door with that gun. The police thereafter recovered a gun that was not the one used in the shooting, in a flower pot at the front of the house. That gun had a DNA mixture profile that was consistent (although not conclusively so) with DNA from both Mr. Hudson and Ms. Strange.

The Commonwealth argues that Mr. Hudson did not have a gun, largely based on Mr. Thomas' testimony that he did not see Mr. Hudson with a gun at any point in the evening, including just before the shooting. If Mr. Hudson had no gun, then Defendant left the room, armed himself, and came back to shoot a man whom his family considered a *de facto* brother-in-law for no reason. The Court does not believe that is a reasonable interpretation of the evidence.

Defendant's testimony was credible. He was in the presence of an intoxicated, ranting and raving large man with a weapon. He has maintained from his first encounter with law enforcement that the victim had a gun and that he was acting in self-defense. He did tell the magistrate on the night of the arrest that Mr. Hudson "cocked" the gun and pointed it at him, triggering Defendant's reaction to shoot in self-defense. In rebuttal, the Commonwealth relied on expert testimony indicating that the gun found in the flower pot was not cocked. A firearms expert from the Department of Forensic Science, Ms. Lake, described the tricky process involved with that type of gun in releasing a cocked hammer without causing the gun to fire, a process that neither Mr. Hudson nor Ms. Strange would likely have undertaken following the shooting.

The Commonwealth urges the Court to resist the conclusion that the gun in the flower pot was the one Defendant claims Mr. Hudson had wielded and minimizes the significance of the DNA mixture profile found on that gun. On the other hand, it argues that the gun was not cocked; so, if it was Mr. Hudson's gun, Defendant's testimony that the victim cocked the hammer is untrue. At trial, Defendant testified that he "thought" Mr. Hudson cocked the hammer, retreating somewhat from his statement to the magistrate. The most reasonable interpretation of the physical and testimonial evidence causes the Court to conclude that Mr. Hudson did have a gun, that Ms. Strange removed it from him and ditched it into the flower pot, and that it had not been cocked prior to the shooting. Ms. Strange would have no reason to leave the side of her badly-wounded partner in order to relocate a random gun from the back of the house to the front of the house unless that gun had something to do with the ongoing crisis.

The Commonwealth urged the Court to listen again to the recording of the 911 telephone call that Mr. Hudson made after the shooting. After reporting that he had been shot and needed help, neither Mr. Hudson nor the 911 operator terminated the call, and the recording captured the sounds and voices in the room for the next several minutes. Mrs. Hines, Defendant's wife, at one point spoke to the operator, telling her that her brother-in-law had been shot, that he had pulled a gun on her husband and her husband had shot him. The victim's voice can be heard on the recording thereafter, and the Commonwealth argued that he said that he did not have a gun. After listening to it many times, the Court cannot conclude that his comment establishes that he did not have a gun that night. The Court's best interpretation of the comment is, "I need my gun." That could either mean that he did not have a gun with him, and never did, consistent with the Commonwealth's urging, or that his partner Ms. Strange had removed his gun by that point and he wanted it back. It could mean neither of those two things. It cannot be determined. The statement by Mrs. Hines to the operator, made in the moments after the shooting when she was obviously still under the stress of that event confirmed Defendant's account of what happened. See Virginia Rule of Evidence 2:803(2).

## Conclusions of Law

The Court has reviewed the cases cited by the Commonwealth and concludes that Defendant did not carry his burden of proving that he acted in self-defense. "Justifiable homicide in self-defense occurs where a person, without any fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." *Bailey v. Commonwealth*, 200 Va. 92, 96, 104 S.E.2d 28, 31 (1958).

In this case, according to his testimony, Defendant observed that Mr. Hudson had a gun, walked out of the room, retrieved his own gun from an adjacent room, returned to Mr. Hudson, and fired five shots almost

immediately. If Mr. Hudson's possession of a gun constituted a danger, Defendant had removed himself from that danger when he left the room. Returning to the room with a gun pointed at the victim significantly escalated the danger and undoubtedly caused Mr. Hudson to fear for his own safety. Defendant had the opportunity to retreat and did in fact retreat. He cannot assert any privilege to return to the room with a weapon of his own and trigger a shoot-out with the Mr. Hudson. Therefore, the Court rejects his defense.

The Commonwealth charged Defendant with first-degree murder. The Court finds that the Commonwealth did not carry its burden of proving premeditation, a necessary element of first degree murder. To premeditate "means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." *Smith v. Commonwealth*, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980). As the Court held, "The exact state of the defendant's mind at the time of the killing is the crucial factor in determining intent. It is the will and purpose to kill, not necessarily the interval of time, which determines the grade of the offense." *Smith*, 220 Va. at 700-01, 261 S.E.2d at 553, *quoting Akers v. Commonwealth*, 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975). No evidence supported any conclusion that Defendant had the will and purpose to kill his sister's partner in the tumult of that evening.

Likewise, the Commonwealth's evidence fell short of proving that Defendant acted with malice, a necessary element of second-degree murder. The Model Jury Instruction definition of malice instructs:

> Heat of passion excludes malice when that heat of passion arises from provocation that reasonably produces an emotional state of mind such as hot blood, rage, anger, resentment, terror, or fear so as to demonstrate an absence of deliberate design to kill or to cause one to act on impulse without conscious reflection.

VMJI No. 33.220 (Malice definition).

The Court concludes that the above-quoted definition applies to the facts at bar and support a conviction for voluntary manslaughter, a lesser-included felony under the indictment. Voluntary manslaughter is the appropriate finding upon evidence that an intentional, non-malicious homicide occurred as a result of heat of passion induced by reasonable provocation. *Couture v. Commonwealth*, 51 Va. App. 239, 249, 656 S.E.2d 425, 430 (2009). "The *furor brevis* of voluntary manslaughter can include 'fear' of harm as well as rage." *Id.* at 249, *quoting McClung v. Commonwealth*, 215 Va. 654, 657, 212 S.E.2d 290, 292 (1975).

Professor Bacigal addressed this issue in a comment that applies pointedly to these facts:

> Fear is another emotion that can reduce what would otherwise be murder to voluntary manslaughter. If fear was adequately and in fact provoked, but is insufficient for self-defense, the resultant killing is voluntary manslaughter . . . . Thus it seems the fearful killer is a manslaughterer when his fear is produced by facts insufficient to make him a self-defender, e.g., the deadly response was unnecessary or the fear was unreasonable.

Ronald J. Bacigal, *Criminal Offenses & Defenses in Virginia*, 358-59 (2007-08 ed.).

The Court finds that Defendant was alarmed by the victim's belligerent conduct and became more alarmed and afraid when he perceived the gun. He should have retreated to safety but instead got a gun of his own and, out of fear and upon impulse, without conscious reflection or malice, he shot the victim.

## Conclusion

The Court finds Defendant guilty of voluntary manslaughter.

The Court directs the Clerk to prepare an order consistent with the findings recited herein and to order the probation department to prepare a presentence investigation report on Defendant. The Court directs counsel to contact the Clerk's Office to schedule this matter for a sentencing hearing.

### June 9, 2014

Defendant moves to vacate his conviction of voluntary manslaughter as contrary to law, and the Commonwealth moves to amend the firearm charge from Virginia Code § 18.2-53.1 (use of a firearm in the commission of a felony) to § 18.2-53 (shooting in the commission of a felony). The Court has fully considered the legal memoranda and argument of counsel. As stated herein, Defendant's motion is overruled, and the Commonwealth's motion is granted.

Defendant argues that the Court's factual findings, as set forth in its Letter Ruling of April 7, 2014, reveal that the Court's conclusions of law are plainly incorrect. He argues that "there is absolutely no duty to retreat in your own home" and that "one does not waive his right to assert a self-defense claim by arming himself and returning to confront his aggressor." Def's Motion at 5 (May 22, 2014).

The Court rejected Defendant's defense because the facts did not indicate that he was in reasonable fear of imminent death or injury to himself or his family from the victim, nor had the victim taken an overt step to suggest that he intended imminent deadly action. In these regards, the case is quite distinguishable from *Gilbert v. Commonwealth*, 28 Va. App. 466, 506 S.E.2d 543 (1998), on which Defendant strongly relies. The

Court's statement in the prior opinion that Defendant had the opportunity to retreat and did in fact retreat was a finding of fact which demonstrated that Defendant was not in danger of any imminent deadly action. The victim, a long-time acquaintance and *de facto* member of the family, had never hurt Defendant or his family. In contrast, the *Gilbert* defendant had been beaten into unconsciousness and maimed by his assailants who had also expressed their intent to kill him. The controlling case law upon which the *Gilbert* Court relied requires that the person arming himself in self-defense "has been threatened with death or serious bodily harm and has reasonable grounds to believe that such threats will be carried into execution." *Gilbert*, 28 Va. App. at 473, 506 S.E.2d at 547, *quoting Bevley v. Commonwealth*, 185 Va. 210, 215, 38 S.E.2d 331, 333 (1946). The Court concluded that Defendant had not been threatened with death or serious bodily harm and did not have reasonable grounds to believe that the victim was going to hurt him. The Court did make the following statement in its April 7 opinion: "Defendant was alarmed by the victim's belligerent conduct and became more alarmed and afraid when he perceived the gun. *He should have retreated to safety* but instead got a gun of his own, and out of fear and upon impulse, without conscious reflection or malice, he shot the victim."

The Court acknowledges that the quoted and italicized language seems to recognize a duty that does not exist under Virginia law in that a homeowner has no obligation to retreat "if assaulted in his dwelling." *Fortune v. Commonwealth*, 133 Va. 669, 687, 112 S.E. 861, 867 (1922). The Court retracts that italicized language and clarifies its prior opinion to recognize that Defendant was not *obliged* to retreat, but, inasmuch as he was able to leave the room safely and had no reasonable belief that the victim was going to hurt him or his family, the Court rejects the conclusion that he acted in self-defense when he returned to the room and immediately shot the victim five times. Therefore, the Court does not vacate its finding of guilt of the lesser-included charge.

The Commonwealth originally charged Defendant with using a firearm while committing one of the felonies listed in Virginia Code § 18.2-53.1. The Court found Defendant guilty of voluntary manslaughter, a lesser-included felony under the original indictment for first degree murder. Because voluntary manslaughter is not a predicate felony under the statute, the Commonwealth moves to amend the indictment to permit Defendant to be found guilty of shooting another person in the commission of a felony under Virginia Code § 18.2-53. The Court finds that this amendment does not change the nature and character of the offense nor come as a surprise to Defendant. The Court grants the motion and permits the indictment to be so amended. Accordingly, the Court, having previously vacated the finding of guilt under Virginia Code § 18.2-53.1 (use of a firearm in commission of a felony), now finds Defendant guilty of § 18.2-53 (shooting in the commission of a felony) under the amended indictment.